## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JEFFREY H. GOODE, PhD.,

    Plaintiff,

      v.

JAMES H. BILLINGTON, LIBRARIAN OF
CONGRESS, LIBRARY OF CONGRESS,

    Defendant.

**Civil Action No. 10-929 (CKK)**

## MEMORANDUM OPINION
(March 25, 2013)

Plaintiff Jeffrey Goode filed suit against Defendant James Billington in his official capacity as the Librarian of Congress, alleging religious discrimination (Jewish), retaliation, and a hostile work environment in violation of Title VII of the Civil Rights Act of 1991, as amended, 42 U.S.C. § 2000e, *et seq.* Presently before the Court are the Defendant's [32] Motion for Summary Judgment and the Plaintiff's [34] Cross-Motion for Partial Summary Judgment. Upon consideration of the pleadings,[1] the relevant legal authorities, and the summary judgment record, the Court finds the Defendant is entitled to summary judgment on the Plaintiff's hostile work environment, discrete discrimination, and retaliation claims. Accordingly, the Defendant's motion is GRANTED and the Plaintiff's cross-motion is DENIED.

## I. BACKGROUND

The Plaintiff, a Jewish male, has a doctorate degree in economics. Def.'s Ex. 3 (Pl.'s

---

[1] Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. [32]; Pl.'s Opp'n to Def.'s Mot. ("Pl.'s Opp'n"), ECF Nos. [37-38]; Def.'s Reply, ECF No. [43]; Pl.'s Cross-Mot. for Partial Summ. J. ("Pl.'s Cross-Mot."); Def.'s Opp'n to Pl.'s Cross-Mot., ECF No. [36]; Pl.'s Reply, ECF No. [44].

Dep. Tr.) at 14:3, 17:3.  The Plaintiff worked for various executive agencies between 1981 and

2008.  *Id.* at 22:8-41:2.  In July 2008, the Plaintiff was hired as a Section Research Manager in

the International Trade and Finance Section of the Foreign Affairs, Defense, and Trade Division

("FDT") of the Congressional Research Service.  Def.'s Stmt. ¶ 6.[2]  The Congressional Research

Service ("CRS") is a unit within the Library of Congress that provides research and analysis in

response to requests from Congressional committees and individual members of Congress.  *Id.* at

¶ 1.  The CRS is comprised of five research divisions, with "Section Research Managers"

responsible for supervising research analysts within each division.  *Id.* at ¶¶ 2-3.  Prior to the

institution of the Section Research Manager position in 2008, individual analysts within each

section served, sometimes on a rotating basis, as "section heads."  Pl.'s Resp. Stmt. ¶ 4.

The Plaintiff, like all new employees of the Library, was required to serve a one-year

probationary period.  Def.'s Stmt. ¶¶ 7-11.  Between July 2008 and September 5, 2008, Charlotte

Preece served as the Plaintiff's immediate supervisor.  Pl.'s Resp. Stmt. ¶ 13.  From September

6, 2008, until December 22, 2008, Ed Bruner served as the Plaintiff's immediate supervisor.

Def.'s Stmt. ¶ 24.  Morris Davis served as the Plaintiff's immediate supervisor from December

23, 2008, until the Plaintiff's termination.  *Id.* at ¶ 36.

A.    *Incidents Involving the Plaintiff's Office*

Ray Ahearn served as the section head of FDT prior to the Plaintiff being hired as the

---

[2]  The Court strictly adheres to the text of Local Civil Rule 7(h) when resolving motions
for summary judgment.  Sched. & P. Order, ECF No. [20] ("The Court assumes facts identified
by the moving party in its statement of material facts are admitted, unless such a fact is
controverted in the statement of genuine issues filed in opposition to the motion.").  Thus, where
possible, the Court shall cite only to the Defendant's Statement of Material Facts ("Def.'s
Stmt.") unless a statement is contradicted by the Plaintiff, in which case the Court may cite the
Plaintiff's Response to the Defendant's Statement of Material Facts ("Pl.'s Resp. Stmt.").  The
Court shall also cite directly to evidence in the record, or if undisputed and not otherwise
evidenced, the parties' pleadings.

Section Research Manager.  Def.'s Stmt. ¶ 14.  Ray Ahearn remained as an analyst in the FDT division under the Plaintiff's supervision.  Def.'s Ex. 12 (OIC Invest. Aff. of R. Ahearn) at 2. On three occasions in August 2008—twice on August 19 and once on August 21—Mr. Ahearn's nameplate was removed from the door of his office and placed on the door to Plaintiff's office. Pl.'s Resp. Stmt. ¶ 14.  The Plaintiff understood the moving of the nameplate to be sending a message that the Plaintiff "[was] not wanted.  Get lost.  You don't belong here.  I want Ray." Def.'s Ex. 3 at 83:22-25; *see also id.* at 85:7-20; Def.'s Ex. 7 (Pl.'s OIC Invest. Aff.) at 4 ("Someone clearly was determined to send a message that I should be removed, and that the former boss should be reinstated.").

The Plaintiff informed Ms. Preece of the incidents, and Ms. Preece responded by keeping Mr. Ahearn's nameplate in her office until Mr. Ahearn returned to the office.  Def.'s Stmt. ¶ 17. The Plaintiff further notified Mr. Ahearn, who indicated that he also had a problem with his nameplate disappearing for over a week at some earlier point in time.  Def.'s Ex. 9 (8/25/2008 Email Pl. to R. Ahearn).  Mr. Ahearn also mentioned to the Plaintiff that someone had set a picture of a naked woman as the screensaver on Mr. Ahearn's computer when he stepped away from his office.  Def.'s Ex. 3 at 83:14-21.  The Plaintiff testified that he had suspicions as to who was responsible for moving the nameplate, but never mentioned those suspicions to his supervisors.  *Id.* at 84:17-23.  After Ms. Preece took possession of Mr. Ahearn's nameplate, it was never again placed on the door to Plaintiff's office.  Def.'s Stmt. ¶ 18.

The Plaintiff, a fan of the New York Yankees, stored a Yankee's baseball cap in his office.  Def.'s Ex. 3 at 85:24-86:11.  The Plaintiff asserts that at some point in the middle August 2008, someone removed the cap from the Plaintiff's office.  Pl.'s Resp. Stmt. ¶ 19.  The Plaintiff mentioned to Ms. Preece that the cap was missing, but "did not make a big deal about it at the

time."  Def.'s Ex. 7 at 5.   Nor did the Plaintiff indicate that he believed the cap was stolen because of the Plaintiff's religion.  Def.'s Ex. 3 at 167:15-23.

The Plaintiff also displayed a picture of the Old City of Jerusalem in his office.  Def.'s Stmt. ¶ 20.  The photograph depicted an alley and building, with the caption stating either the name of the street or that the picture was taken in Jerusalem.  Def.'s Ex. 3 at 88:14-90:4.  At some point in late August or early September 2008, the picture was removed from the Plaintiff's office.  *Id.*  The Plaintiff reported to his supervisor at some point that the picture was taken, but could not recall when.  *Id.* at 168:4-13.  The Plaintiff indicated that he "didn't want to tell them right away" because he "didn't want to make a big deal about it."  *Id.* at 168:18-20; *see also id.* at 168:21-22 (indicating the picture was "not worth a lot of money").  There is evidence in the record to suggest the Defendant did not notice the picture was missing until a co-worker mentioned it several months later.  Pl.'s Ex. 8 (OIC Invest. Report) at 16.  The Plaintiff did not report the theft of the picture or his Yankee's cap to the Library of Congress Police.  Def.'s Ex. 3 at 168:25-169:1; *see* Def.'s Ex. 14 (Library of Cong. Reg. 111.2) ("The loss or theft of personal property in Library buildings or on the grounds should be reported as soon as practicable to the Library of Congress Police, who will take a report.").

B.     *Plaintiff's Work Performance*

Beginning in October 2008, Mr. Bruner held a number of meetings with the Plaintiff which involved discussions of the Plaintiff's work.  Pl.'s Resp. Stmt. ¶ 25.[3]  During the October 8, 2008 meeting, Mr. Bruner relayed to the Plaintiff several complaints he had received from analysts under the Plaintiff's supervision, including that the Plaintiff (1) inappropriately or

---

[3]   The parties disagree as to whether the meetings should be classified as regularly scheduled meetings to discuss the status of the FDT division's work, or "informal" counseling sessions.  Nevertheless, the topics discussed during the meetings are undisputed.

arbitrarily assigned research requests from Congress with little regard for the specialties of particular analysts; (2) had an "autocratic" rather than collegial leadership style; (3) persistently advocated for projects in which he had a personal interest despite more pressing congressional needs; and (4) expressed dissatisfaction with his section to a junior analyst in another section. Def.'s Ex. 4 (12/17/2008 Mem. E. Bruner to Pl.) at 1-2.  On November 4, 2008, Mr. Bruner submitted an assessment of four Section Research Managers, including the Plaintiff, to Angela Evans, the Deputy Director of the CRS.  Def.'s Ex. 17.  With respect to the Plaintiff, in addition to several positive comments, Mr. Bruner indicated that the Plaintiff "wasted some of his and analysts' time advocating a personal idea for the research agenda without first determining a Congressional need for the research," took a long time to review work product from analysts, and "alienated many members of the [the section] due to a sometimes gruff manner (to include shouting), some apparently arbitrary decisions, an authoritarian outlook, and lack of consultation."  *Id.* at 5.  Two days later, Mr. Bruner also sought guidance regarding how to document performance or fitness issues of probationary employees.  Def.'s Ex. 18 (11/6/2008 Email D. Duffy to E. Bruner).

Mr. Bruner met with the Plaintiff again on November 20, 2008.  Pl.'s Resp. Stmt. ¶ 29. Mr. Bruner indicated that since the October meeting, the analysts in the Plaintiff's section indicated that "not much has changed," and "Section morale continues to decline."  Def.'s Ex. 4 (12/17/2008 Performance Counseling Meeting Mem.) at 2.  Furthermore, Mr. Bruner "received reports and complaints from several sources that sounds of yelling have emerged from your office," and that several analysts complained that the Plaintiff delegated too many tasks, and added an additional level of review that led to deadlines being missed.  *Id.* at 3.  Mr. Bruner also questioned the Plaintiff's decision to deny a senior analyst's request to attend a conference

regarding a subject for which the analyst was responsible.  *Id.*

Angela Evans met with various sections, including FDT, in order to discuss how the new Section Research Manager position was working out in late 2008.  Def.'s Ex. 19 (Aff. of W. Cooper) ¶ 3.  In preparation for their meeting with Ms. Evans, the Plaintiff's section asked analyst William Cooper to serve as a "spokesperson" and even held a practice session in which Mr. Cooper practiced presenting talking points conveying the section's concerns regarding the Plaintiff.  *Id.* at ¶ 4; *see* Def.'s Ex. 20 (Talking Points for "Meeting with Angela Regarding SRM").  All thirteen analysts in the Plaintiff's section attended the meeting, during which they "addressed myriad concerns [they] had about Mr. Goode, including, but not limited to," the Plaintiff's "seeming lack of knowledge of the subject matter areas," the role of Congress, and the role of the CRS in assisting Congress.  *Id.* at ¶ 5.  The analysts also expressed concerns that the Plaintiff delegated his review responsibilities to other members of the section, missed review deadlines, and was reluctant to "reach out to congressional clients."  *Id.*

On December 17, 2008, Mr. Bruner issued a counseling memorandum to the Plaintiff, recounting their discussions in the October 8 and November 20 meetings, and indicating that "[s]ome of your comments and actions I have observed call into question your understanding and commitment to the CRS mission."  Def.'s Ex. 4 at 3.  Mr. Bruner also indicated that "your performance and general fitness for retention in your position can be evaluated at any time during your term as a probationary employee.  The evidence before me indicates that your personality and skills may not ensure the good fit we need between you and your Section."  *Id.* at 4.

Morris Davis replaced Ed Bruner as the Plaintiff's immediate supervisor on December 22, 2008.  Def.'s Stmt. ¶ 36.  On January 26, 2009, Mr. Davis and Mr. Bruner (now the Deputy

Assistant Director of FDT) conducted the Plaintiff's six month performance and conduct evaluation. Def.'s Ex. 23 (Pl.'s Performance & Conduct Eval.) at 1. Prior to the meeting, the Plaintiff's supervisors consulted with the Library's legal team to draft the written six-month evaluation which was designed to "set up the termination and/or the resolution agreement." Def.'s Ex. 37 (1/16/2009 Email D. Warshof to D. Duffy, *et al.*). Overall, the written summary of the Plaintiff's evaluation concluded that while the Plaintiff "paid close attention to his administrative duties," and "provided clear guidance to two underperforming analysts in his section," he had yet to demonstrate "that he has all the research management skills needed to perform effectively," in his position at the CRS. *Id.* Specific concerns included "a serious communication gap between [the Plaintiff] and his section members," the Plaintiff did not "ma[ke] much of an effort to establish the congressional contacts needed to properly manage the work of the section." *Id.* "In aggregate, the situation described has resulted in poor working relationships between [the Plaintiff] and his analysts." *Id.* The evaluation concluded by indicating that:

> Based on the above, the [Mr. Bruner] will be forwarding a recommendation shortly regarding Mr. Goode's retention during the probationary period. In the attached counseling memorandum, [i]t was indicated to him that improvements must be immediate and sustained in order to demonstrate his fitness for conversion to permanent status. To date, there have not been detected sufficient, necessary changes in his overall performance, and the concerns regarding his general fitness for this position persist.

*Id.* at 1-2. The Plaintiff asserted in his deposition that he told Mr. Bruner and Mr. Davis during the January 2009 evaluation that the Plaintiff might file a complaint regarding his perceived hostile work environment. Pl.'s Ex. 6 (Pl.'s Dep. Tr.) at 153:3-13.[4] When asked during his

---

[4] Unless otherwise indicated, all references to the Plaintiff's exhibits refer to the exhibits attached to the Plaintiff's Opposition to the Defendant's Motion for Summary Judgment.

deposition what the basis for any claim of religious discrimination at that time might have been, the Plaintiff replied:

> The basis might have been, then, I don't know.  I was just telling them that I don't like what's happening to me.  I'm going to complain[] about it.  This is just not right.  I'm not being treated right.  There was the Jerusalem thing.  There was a Yankee hat. There was my sign, my nameplate raised, being put on my door. There was constant people complaining about innocuous things in my mind.

*Id.* at 153:17-24 (all errors in original).

The Plaintiff replied in writing to the six month evaluation.  Def.'s Ex. 24 (2/2/2009 Mem. Pl. to A. Evans, M. Davis, & E. Bruner).  The Plaintiff noted that "it seems that I will not be the Section Research Manager too much longer," and expressed his feeling that he had not been given "clear guidance and a genuine chance to improve [his] performance."  *Id.* at 1; *see also id.* ("[M]y time seems to be running out.").  The Plaintiff expressed his belief that "[t]he entire process has been adversarial with attention paid to the legalities of removing me instead of improving my performance."  *Id.*  The memorandum emphasized the number of new CRS reports his section had completed and the group awards his section received since his arrival.  *Id.* at 2.  The Plaintiff asked that "if you remove me from my Section Research Manager position," that he be permitted to (1) work as an analyst or on a special project until the Plaintiff could "find a new job elsewhere or resurrect my reputation at CRS"; (2) take leave while looking for a new position but "remain a CRS employee so I would not have any break in service before obtaining a new position"; or (3) permit the Plaintiff to take early retirement.  *Id.*; *see also* Pl.'s Ex. [6] (Pl.'s Dep. Tr.) at 137:20-25 ("By then I saw I wasn't going to be the manager anymore, and I wrote that memo.  So I wanted out.  I mean they wanted me out.  I wanted out just as much, and I wrote that memo to give me time.").

Following the Plaintiff's six month evaluation, Mr. Davis contacted the legal department

for the CRS to request a sample letter to the Director of the CRS recommending separation during an employee's probationary period, which was provided on February 4, 2009.  Def.'s Stmt. ¶ 40; Def.'s Ex. 25 (2/4/2009 Email D. Warshof to M. Davis).  On February 4, 2009, Morris Davis spoke with the Plaintiff "and told him to weigh his options."  Def.'s Ex. 6 at 10. The Plaintiff asked if the Library could make him an analyst while he looked for other employment or until he was eligible for retirement in April 2010, but Morris Davis indicated "we didn't need an analyst in the section, we needed an SRM."  *Id.*  The Plaintiff also consulted with human resources in order to determine if he could take early retirement.  *E.g.*, Pl.'s Ex. 6 at 152:7-10; Def.'s Ex. 13 (Compl. of Discrimination at 6).  After further discussions Mr. Davis informed the Plaintiff that "if he didn't decide soon" between resignation or termination, Mr. Davis "would have no choice but to give him the 30 day termination notice."  Def.'s Ex. 6 at 10. Mr. Davis began drafting the letter to Dan Mulhollan, the director of the CRS, on February 4, 2013.  *Id.* at 10-11.

      C.    *February 5, 2009 Incident & Plaintiff's Termination*

According to the Plaintiff, upon arriving at his office on the morning of February 5, 2009, he discovered a type-written sign hanging on the back of the door to his office reading "GOOD RIDDANCE JEW BOY."  Pl.'s Resp. ¶ 43.  The Plaintiff contends that he immediately called the United States Capitol Police to report the sign.  *Id.*  The Defendant alleges that, based on the testimony of Jared Nagel, an administrative assistant within the CRS, there is reason to believe the Plaintiff placed the sign on his door.  Def.'s Stmt. ¶ 43; *see* Def.'s Ex. 28 (OIC Invest. Aff. of J. Nagel) at 3 (indicating the Plaintiff told Mr. Nagel that the police would be arriving shortly, before the Plaintiff had an opportunity to go to his office to discover the sign).  Regardless, the order of events that followed is generally undisputed.  The Capitol Police took photographs and

dusted the door, sign, and the magnet holding the sign for fingerprints.  Pl.'s Ex. 2 (Crime Scene

Analysis Report).   One of the responding officers, Officer Brandon Jon Pigg, testified that

Morris Davis informed him that the CRS was in the process of terminating the Plaintiff.  Def.'s

Ex. 30 (Pigg Dep. Tr.) at 17:14-18:5.

 The same day as the incident, someone within the CRS also informed Kenneth Keeler, an

Assistant Inspector General for Investigations, about the incident and Plaintiff's impending

termination.   Def.'s Ex. 27 (Decl. of K. Keeler) ¶ 2.   Mr. Keeler emailed Alan Morris of the

Capital Police stating:

> I just learned that a USCP Lt. recently investigated a complaint about anti-Semitic
> material found in or around the work area of Jeffrey Goode, a Library employee.
> We have some important information relevant to Mr. Goode's complaint. Also,
> since this is an internal complaint that we would investigate, would you please ask
> the investigating officer to contact my office as soon as possible.

Pl.'s Ex. 7 (2/5/2009 Email K. Keeler to A. Morris) at 2.  Mr. Morris indicated he was not aware

of any investigation, and copied Mr. Keeler's message to Captain Dogan of the Capitol Police to

determine who was involved in the investigation.  *Id.*  Captain Dogan replied that:

> I learned late today that there was a report of such but Lieut [sic] Greene was
> leaning towards it not having much merit. The complainant is facing imminent
> termination and was supposed to have stated to someone as he entered his work
> area that the police will be reporting here soon. I am having some issue about
> what the OIG will or will not investigate. This topic has never been completely
> discussed. I will ask Greene to forward to OIG at your direction.

*Id.*  The email chain was forwarded to Morris Davis on February 9, 2009.  *Id.* at 1.  Diane Duffy

indicated that "[a]lthough CRS wasn't copied on these emails, Denise McCray (Workforce

Management, LOC) sent them to [Duffy] this morning to make sure we were aware of the IG's

involvement."  *Id.*  "The [Office of the Inspector General] deferred to the [Capitol Police]

inquiry and did not pursue the matter any further."  Def.'s Ex. 27 ¶ 5.  On February 27, 2009,

Lieutenant Greene indicated that "[t]he status of the investigation is, [sic] Mr. Goode's complaint

had no merit requiring no further Police involvement."  Def.'s Ex. 36 (2/27/2009 Email Lt. Greene to M. Dogan).

At some point between February 2 and February 5, 2009, Morris Davis offered the Plaintiff the choice between resigning and being terminated.  Def.'s Stmt. ¶ 41; Def.'s Ex. 6 (OIC Invest. Aff. of M. Davis) at 10.  On February 5, 2009, Mr. Davis forwarded a draft of a letter recommending the Library terminate the Plaintiff's employment.  Def.'s Ex. 26 (2/5/2009 Email M. Davis to D. Warshof).  Mr. Davis, Mr. Bruner, and the Plaintiff met once again on February 6, 2009.  Def.'s Stmt. ¶ 50.  Mr. Davis and Mr. Bruner asked the Plaintiff if he had decided whether or not to resign, to which the Plaintiff replied "that's like asking how you want to die . . . hanging or shooting."  Pl.'s Ex. 6 at 151:18-152:11.  The Plaintiff threatened to file a complaint if he was terminated, causing Mr. Davis to immediately end the meeting.  *Id.* at 152:12-19; Def.'s Stmt. ¶ 50.  Mr. Davis stated in an affidavit that "[h]is threat solidified my decision, so I ended the discussion and went back to my office to finalize the termination recommendation."  Def.'s Ex. 6 (OIC Invest. Aff. of M. Davis) at 11.  Mr. Davis sent a memorandum to Daniel P. Mulhollan, the Director of the CRS, recommending that the Plaintiff be separated from employment with the CRS.  Def.'s Ex. 32 (2/6/2009 Mem. M. Davis to D. Mulhollan).  Later that day, the Plaintiff received a termination letter signed by Director Mulhollan, stating that

> you have made no meaningful effort to ascertain and address the needs of the Congress related to your section's area of expertise; you have failed to lead your section to produce international trade and finance products relevant to the debate on topics of legislative interest to the Congress, including the global financial crisis and the proposed economic stimulus plans; and, most seriously, you have alienated your subordinates and have adversely impacted the morale of your section.

Def.'s Ex. 31 (2/6/2009 Ltr. D. Mulhollan to Pl.) at 1.

On February 10, 2009, the Plaintiff filed an informal complaint with the Library's Office of Opportunity, Inclusiveness & Compliance. *See* Def.'s Ex. 35 (Description of Compl. & Invest.). The Plaintiff filed a formal complaint of discrimination on March 23, 2009. Def.'s Ex. 13 (Compl. of Discrimination). In response to the Plaintiff's formal complaint, the Library conducted an investigation into the Plaintiff's allegations, which was completed on August 7, 2009. Def.'s Stmt. ¶ 56; Pl.'s Ex. 8 (Description of Compl. & Invest.). The Library issued a Final Agency Decision with respect to the complaint on May 4, 2010. Compl. ¶ 8.

The Plaintiff filed suit in this court on June 4, 2010. *See generally* Compl. The Plaintiff asserts three discrete charges: (1) the Plaintiff was subject to a hostile work environment on the basis of his religion; (2) discriminating against the Plaintiff by terminating him on the basis of his religion; and (3) retaliating against the Plaintiff by terminating him in retaliation for his protected activity, that is, threatening to file complaints regarding his perceived hostile work environment. *See generally id.* at ¶¶ 115-17. Following discovery, the parties filed cross-motions for summary judgment, with are now ripe.

## II.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).   "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."   Fed. R. Civ. P. 56(e).   When considering a motion for summary judgment, the court may not make credibility determinations or weigh the evidence; the evidence must be analyzed in the light most favorable to the nonmoving party, with all justifiable inferences drawn in his favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).   "If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available."  *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (citation omitted).

The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment.  *See Liberty Lobby*, 477 U.S. at 248.   "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id*.   For a dispute about a material fact to be "genuine," there must be sufficient admissible evidence that a reasonable trier of fact could find for the nonmoving party.  *Id*.   The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52.   "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted."  *Id*. at 249–50 (citations omitted).   The adverse party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute.  *See Ass'n of Flight*

13

*Attendants–CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009).

## III. DISCUSSION

### A.   Framework for Plaintiff's Title VII Claims

Title VII provides two theories under which a plaintiff may recover for discriminatory conduct.  First, 42 U.S.C. § 2000e–2(a)(1) bars discrimination "because of ... [an] individual's race, color, religion, sex, or national origin."  A plaintiff can establish liability under this provision by showing that a protected characteristic, in this case the Plaintiff's religion, was a but-for cause of the adverse employment action.  *Ponce v. Billington*, 679 F.3d 840, 844 (D.C. Cir. 2012).  This is commonly referred to as the "pretext" theory of discrimination.  *Fogg v. Gonzales*, 492 F.3d 447, 451 (D.C. Cir. 2007).  "A plaintiff who establishes but-for causation may recover damages, as well as declaratory and injunctive relief."  *Ponce*, 679 F.3d at 845.

Second, 42 U.S.C. § 2000e–2(m) provides that "an unlawful employment practice is established when . . . race, color, religion, sex, or national origin was a motivating factor for any employment practice."  A plaintiff can prevail under this section by showing that unlawful discrimination was "a factor motivating the adverse action."  *Ginger v. District of Columbia*, 527 F.3d 1340, 1345 (D.C. Cir. 2008).  This is commonly known as a "mixed-motive" theory of discrimination.  *Ponce*, 679 F.3d at 844.  "[R]elief in a mixed-motive case is limited to 'declaratory relief,' certain 'injunctive relief,' and certain fees and costs if the defendant 'demonstrates that [it] would have taken the same action in the absence of the impermissible motivating factor.'"  *Id.* (quoting 42 U.S.C. § 2000e–5(g)(2)(B)).  "[A] plaintiff may proceed under both theories simultaneously."  *Id.* at 845.  A plaintiff "need not expressly allege in the complaint that the action is either a 'pretext' or a 'mixed-motives' case," and "may ultimately decide to proceed under both theories of liability."  *Id.*

14

As the parties' summary judgment pleadings indicate, the Plaintiff is pursuing his discrete discrimination claim and retaliation under both pretext and mixed-motive theories.[5]  The Court begins with the Plaintiff's hostile work environment claim, finding there is no genuine issue of material fact precluding summary judgment in favor of the Defendant.  The Court then analyzes the Plaintiff's discrete discrimination claim, concluding that—under either theory of liability—no reasonable jury could conclude the Plaintiff's termination was based on his religion.  Finally, looking to the Plaintiff's retaliation claim, the Court finds no reasonable jury could conclude from the evidence in the record that the Plaintiff was terminated because of his threat to file a hostile work environment complaint.

B.    *Hostile Work Environment Claim*

Title VII of the Civil Rights Act prohibits an employer from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e–2(a)(1).  Toward that end, an employer may not create or condone a hostile or abusive work environment that is discriminatory.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64–65 (1986).  To establish a prima facie Title VII hostile work environment claim, the Plaintiff must show: (1) he was a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment occurred because of his protected status; (4) the harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment; and= (5) that his employer

---

[5]  "[A]lthough every circuit to address the issue" has held the mixed-motive theory does not apply to retaliation claims, "it remains an open question in this circuit."  *Porter v. Natsios*, 414 F.3d 13, 19 (D.C. Cir. 2005).  Because the Defendant is entitled to summary judgment on the Plaintiff's retaliation claim even under a mixed-motive theory, the Court does not reach this issue.

knew or should have known of the harassment and failed to implement prompt and appropriate

corrective action.  *See Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1122-23 (D.C. Cir. 2002);

*Curry v. District of Columbia*, 195 F.3d 654, 660 (D.C. Cir. 1999).[6]

A workplace becomes "hostile" for purposes of Title VII only if the allegedly offensive

conduct "permeate[s] [the workplace] with discriminatory [or retaliatory] intimidation, ridicule,

and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S.

17, 21–22 (1993) (citation omitted).   This standard has both objective and subjective

components: the work environment must be one that a reasonable person in the plaintiff's

position would find hostile or abusive, and the plaintiff must actually perceive the environment

to be hostile or abusive.  *Id.*  The objective prong requires the Court to evaluate the "the totality

of the circumstances, including the frequency of the discriminatory conduct, its severity, its

offensiveness, and whether it interferes with an employee's work performance." *Baloch v.*

*Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (citing *Faragher v. City of Boca Raton*, 524

U.S. 775, 787–88, (1998)).  "[A] few isolated incidents of offensive conduct do not amount to

actionable harassment." *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002).

The Plaintiff summarizes his hostile work environment claim as follows:

---

[6]   When the alleged harasser is the employee's supervisor, the employer is vicariously liable to the employee.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).  However, "[w]hen no tangible employment action is taken," the employer may raise an affirmative defense comprised of two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.*  As set forth below, the Plaintiff failed to raise a genuine issue as to whether the supervisor harassment was based on his religion.  Therefore this question of the employer's remedial action arises only in the context of a co-worker harassment claim.

> In sum, the GOOD RIDDANCE JEW BOY sign/hate crime directed at Dr. Goode; the theft of Dr. Goode's picture of Jerusalem; and the unreasonable hostility levied at Dr. Goode by his supervisors as they papered an unreasonable, mean-spirited attack against Dr. Goode's solid performance before firing him under false pretenses are all evidence of the hostile work environment levied at Dr. Goode, which a reasonable jury could find to be severe or pervasive.

Pl.'s Opp'n at 29.[7]   As to the first prong of a hostile work environment claim, there is no dispute that the Plaintiff is Jewish and thus is a member of a protected class.  For purposes of resolving the parties' motions, the Court also assumes that the Plaintiff was subjected to unwelcome harassment.[8]  The Court makes this assumption because the record demonstrates the Plaintiff's claim fails to satisfy the third, fourth, and fifth elements of a hostile work environment.

1. <u>Harassment on the Basis of Protected Status</u>

There is no question that the "Good Riddance Jew Boy" sign was based on the Plaintiff's religion.  The Court shall also assume that the theft of the picture of Jerusalem from the Plaintiff's office was likewise based on the Plaintiff's religion.  However, the Plaintiff proffers no evidence whatsoever that the alleged "unreasonable hostility levied at Dr. Goode by his supervisors," Pl.'s Opp'n at 29, was based on the Plaintiff's religion.  Neither Ed Bruner nor Morris Davis knew the Plaintiff was Jewish until the sign was posted on his door—the day before his termination.  Def.'s Ex. 2 (Bruner Dep. Tr.) at 77:17-21; Def.'s Ex. 6 (OIC Invest.

---

[7]  Because the Plaintiff failed to respond to the Defendant's contentions, the Defendant is entitled to summary judgment that the moving of Ray Ahearn's nameplate and theft of the Plaintiff's baseball cap were unrelated to the Plaintiff's religion.  *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003).  ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").

[8]  Although the record demonstrates that there is a genuine issue of material fact as to whether the Plaintiff placed the offensive sign on his office door, *supra* at 9, this dispute does not preclude summary judgment insofar as the Plaintiff's hostile work environment fails on other grounds.

Aff. of M. Davis) at 4, ¶ 10.   "[H]ostile behavior, no matter how unjustified or egregious, cannot support a claim of hostile work environment unless there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class."   *Nguyen v. Mabus*, ─── F.Supp.2d ────, No. 09–1349, 2012 WL 4475670, at *20 (D.D.C. Sept. 30, 2012).   The Plaintiff fails to provide any evidence to suggest his supervisors knew he was Jewish before the conduct at issue, much less any evidence that their actions were based on his religion.   Therefore, the Defendant is entitled to summary judgment to the extent the Plaintiff claims his supervisors' conduct created a hostile work environment.

2.   Severity or Pervasiveness of the Alleged Harassment

The fourth element of a hostile work environment claim requires the Plaintiff to show that, subjective and objectively, the alleged harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."   *Harris*, 510 U.S. at 21–22.   The Plaintiff runs into difficulty at this juncture with respect to the theft of the picture of Jerusalem because he admits that, at the time the picture was taken, he subjectively did not believe the act was related to his religion.   Def.'s Ex. 13 (Pl.'s OIC Invest. Aff.) at 4, ¶ 5 ("The Jewish theme of this incident was lost on me at the time.   It took prodding by one of my employees . . . and finally the last incident on February 5, 2009, before I pieced together that this was an anti-Semitic act.").   It is not even clear that the Plaintiff noticed the picture was removed in the first place.   Pl.'s Ex. 8 at 16 (recounting testimony indicating the Plaintiff did not notice the picture was missing until a co-worker inquired about it months later); Def.'s Ex. 15.   Subjectively, the Plaintiff did not view this incident as harassing.

The Plaintiff has asserted that he subjectively found the February 5, 2009, incident to be sufficiently offensive so as to create a hostile working environment.   Objectively the Court finds

18

that a reasonable jury could not conclude that the alleged harassment was either severe or pervasive.  In terms of severity, the Plaintiff argues that "[a] single discriminatory incident, when it is extreme, can constitute a hostile work environment."  Pl.'s Opp'n at 27.  The D.C. Circuit has repeatedly emphasized that "'casual or isolated manifestations of a discriminatory environment, such as a few ethnic or racial slurs, may not raise a cause of action.'"  *Park v. Howard Univ.*, 71 F.3d 904, 906 (D.C. Cir. 1995) (quoting *Bundy v. Jackson*, 641 F.2d 934, 943 n.9 (D.C. Cir. 1981)).  Moreover, each of the cases cited by the Plaintiff involved multiple slurs or multiple incidents of harassment.  *King v. Board of Regents*, 898 F.2d 533, 534-35 (7th Cir. 1990) (involving claims arising from suggestive comments and forcible kissing and fondling over a several months); *Bennett v. Corroon & Black Corp.*, 845 F.2d 104, 105-06 (5th Cir. 1988) (involving claims arising from four obscene cartoons depicting the plaintiff which were displayed in the men's room for approximately one week); *Bailey v. Binyon*, 583 F. Supp. 923, 925 (N.D. Ill. 1984) (involving claims arising from incident in which supervisor called the plaintiff the n-word three times); *Imperial Diner v. State Human Rights Appeal Bd.*, 52 N.Y.2d 72, 72-73 (1980) (involving state law claim arising from incident in which restaurant owner directed two obscene and anti-Semitic remarks at the plaintiff).  The sign posted on the back of the Plaintiff's door was undoubtedly offensive, but the Plaintiff does not even argue that it interfered with his performance.  Based on the totality of the circumstances, no reasonable jury could conclude from this record that the theft of the picture of Jerusalem and the sign posted in the Plaintiff's office "had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment."  *Davis*, 275 F.3d at 1122-23.

The Plaintiff also argues that "[a] reasonable jury could also find the hostile work

environment at the Library to be pervasive, based on Dr. Goode's comments about a hostile work environment (and threatened complaint to his supervisors regarding this hostile work environment) on January 27, 2009 and February 6, 2009." Pl.'s Opp'n at 28. In other words, the Plaintiff contends that the jury could conclude that the environment was hostile because the Plaintiff said it was. Prior to February 5, 2009, the Plaintiff himself did not believe he was subject to harassment *based on his religion*, nor could any reasonable jury. Pl.'s Ex. 6 at 153:17-24. Considering the theft of the picture and the sign together, there is insufficient evidence of any "tangible workplace consequences" from which a reasonable jury could conclude that the purported harassment was either severe or pervasive as required for a hostile work environment claim. *See Baloch*, 550 F.3d at 1201.

### 3.    Defendant's Remedial Efforts

Even if a genuine issue of material fact remained as to the severity or pervasiveness of the harassment, the Defendant is also entitled to summary judgment on the fifth element of the Plaintiff's hostile work environment claim, namely whether the Library "implement[ed] prompt and appropriate corrective action." *Curry*, 195 F.3d at 660. The Plaintiff argues that the Defendant's response to the posting of the sign was insufficient because: (1) CRS management "sabotage[ed]" the investigation conducted by the Capitol Police; and (2) CRS management "discouraged" an investigation by the Office of the Inspector General. Pl.'s Opp'n at 25-26.

The Plaintiff relies entirely on the emails in Plaintiff's Exhibit 7 to support this conclusion. As set forth in the factual discussion, the emails provide no support for the Plaintiff's contentions on this issue. CRS management did inform Lieutenant Greene that they were in the process of terminating the Plaintiff, but the Plaintiff does not explain—much less provide evidence to show—*how* this affected the investigation. Moreover, the Office of the

Inspector General decided not to conduct a parallel investigation *before* informing CRS management of its involvement in the matter. Denise McCray of Workforce Management (human resources) at the Library informed Diane Duffy of the Inspector General's communication with the Capitol Police in a February 9, 2009 email. Pl.'s Ex. 7 at 1. Diane Duffy then forwarded the exchange of emails between the Office of the Inspector General and the Capitol Police to Morris Davis, noting that "Although CRS wasn't copied on these emails, Denise McCray (Workforce Management, LOC) sent them to me this morning to make sure we were aware of the IG's involvement, etc." *Id.* Ultimately, the Capitol Police conducted a prompt investigation, and the Plaintiff fails to articulate why a secondary investigation by the Library was necessary.[9] As the Plaintiff noted, "the very act [of] investigating and making a major scene almost always serves as a deterrent for any future behavior of the same sort." Def.'s Ex. 13 (Pl.'s OIC Compl.) at 2.

Furthermore, the Office of Opportunity, Inclusiveness & Compliance ("OIC") conducted an investigation into the Plaintiff's claim of discrimination and retaliation, which included interviews with at least seven witnesses and review of relevant documents. Def.'s Ex. 34 (amended notice of complaint); Pl.'s Ex. 8. The Plaintiff dismisses this investigation (and the Capitol Police investigation) as an inadequate remedy because the *Plaintiff* initiated the complaint. When an employer has an effective mechanism for reporting and resolving discrimination complaints, the plaintiff must make reasonable efforts to avail himself of those remedies. *Faragher*, 524 U.S. at 806-07. The Library has a reporting mechanism available

---

[9] To the extent the Plaintiff claims the Library failed to investigate the theft of the picture of Jerusalem, this claim lacks merit. The Plaintiff did not report the theft right away because he "didn't want to make a big deal about it." Def.'s Ex. 3 at 168:18-20. The Defendant cannot be faulted for failing to investigate a theft that did not even concern the Plaintiff.

through the OIC, which the Plaintiff made use of in filing his complaint.   The resulting investigation, which the OIC pursued even after the Plaintiff's termination, was a prompt and adequate remedy.   No reasonable jury could conclude from this record that the Library did not take prompt remedial action to resolve the Plaintiff's hostile work environment complaint.   Thus, the Defendant is entitled to summary judgment on this claim.

### C.      Discrete Discrimination Claim

The Plaintiff contends that he was unlawfully terminated on the basis of his religion, under both a pretext and mixed-motive theory of liability.   As set forth below, there is insufficient evidence from which a reasonable jury could conclude the Plaintiff's termination was motivated, even in part, by the Plaintiff's religion.

> Because direct evidence of an employer's discriminatory motives is often elusive, a plaintiff typically establishes but-for causation using the familiar pretext framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the McDonnell Douglas framework, discrimination claims proceed in three steps: (1) the plaintiff must prove a prima facie case of discrimination; (2) if the plaintiff does so, then the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the action in question; and (3) if the defendant meets that burden, the plaintiff must show that the defendant's proffered reasons were "not its true reasons, but were a pretext for discrimination."

*Ponce*, 679 F.3d at 844 (quoting *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (per curiam)).   When, the employer asserts a legitimate, non-discriminatory reason for the adverse employment action, the Court "must resolve one central question:   Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason *and* that the employer intentionally discriminated against the employee on the basis of [his religion]?"   *Hampton v. Vilsack*, 685 F.3d 1096, 1100 (D.C. Cir. 2012) (quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)) (emphasis added).

The parties devote much of the briefing to disputing whether or not the criticisms of the Plaintiff recounted in his six-month evaluation—and echoed in his termination letter—were fair critiques of the Plaintiff's performance.   However, the fundamental problem with the Plaintiff's discrimination claim is that there is no evidence that the Library terminated the Plaintiff, even in part, *because of his religion*.   In his cross-motion, the Plaintiff asserts there is direct evidence of discrimination on the part of the Library in terminating the Plaintiff:

> The phrase "Good Riddance" is direct evidence of Dr. Goode's termination the following day, and the racial slur "Jew Boy" is direct evidence of religious discrimination against Dr. Goode.   As a threatening, hateful message to Dr. Goode, the phrase "GOOD RIDDANCE JEW BOY" constitutes conspicuous, direct evidence of the Agency's discriminatory termination of Dr. Goode.

Pl.'s Cross-Mot. at 7.   This argument is nonsensical.   There is no evidence in the record to suggest the sign was placed on the Plaintiff's door by Morris Davis, Ed Bruner, or any of the Defendant's other supervisors.   The Plaintiff makes no attempt to explain why the sign is attributable to his employer.   The fact that *someone* placed an anti-Semitic sign on the Plaintiff's door is insufficient to create a genuine issue of material fact as to whether the Plaintiff's religion was a motivating factor or a but-for cause of the Plaintiff's termination.

The Plaintiff emphasizes two supposed "findings" to support this contention: (1) that the Capitol Police concluded the incident constituted a hate crime; and (2) the OIC admitted the sign was discriminatory.   The Crime Scene Analysis Report refers to the offense as a "hate crime," but there is nothing to suggest this is anything more than an initial classification for investigation purposes.   Pl.'s Ex. 2 at 5.   Lieutenant Greene ultimately concluded the complaint had no merit, thus this initial characterization has no bearing on whether or not the Plaintiff's termination was in fact discriminatory.   Likewise, the OIC did not admit the sign was discriminatory.   To the contrary, Naomi Earp, the Director of the OIC, explained "I construed the sign in favor of Dr.

Goode.  I questioned the authorship of the sign, *but in completing the analysis, presumed that it was true*.  Found it offensive but still believed at the end of the analysis that *the complainant had not carried his burden*.  Pl.'s Ex. 4 (Earp Dep. Tr.) at 28:9-14 (emphasis added).  In any event, the Plaintiff fails to proffer any evidence or legal theory through which the sign is attributable to the Library such that the sign itself is evidence that the Plaintiff's termination was discriminatory.

Moreover, the sequence of events does not support an inference of discrimination.  Morris Davis initiated the process of terminating the Plaintiff by no later than February 4.  On February 5, the sign was posted on the Plaintiff's door, and the Plaintiff's supervisors learned for the first time that the Plaintiff was Jewish.  That same day, the Morris Davis sent a draft of his letter recommending termination to the legal department.  On February 6, the Library terminated the Plaintiff's employment, as they intended to do before the incident the day prior.  The fact that the Library continued with its previously contemplated plan after learning of the Plaintiff's religious affiliation, even if the Plaintiff's termination was "not yet definitively determined," is "no evidence whatever of causality."  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001).  Simply put, there is no evidence in the record to demonstrate the Plaintiff was terminated to any degree on the basis of his religion.

D.      *Retaliation Claim*

In reviewing a motion for summary judgment with respect to a claim of unlawful retaliation under Title VII, the Court "looks to whether a reasonable jury could infer . . . retaliation from all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and other evidence of retaliation."  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (citation

24

omitted).  The Plaintiff alleges his termination was in retaliation for his threats on January 27 and

February 6, 2009 to file a hostile work environment claim.  The question before the Court is

whether there is sufficient evidence in the record to support summary judgment in favor of either

party.

Initially, the Defendant contends that the Plaintiff's January 27, 2009 threat cannot form

the basis for a claim of retaliation.  As of that date, a hostile work environment complaint would

be based on: (1) moving the Plaintiff's nameplate; (2) the theft of the Plaintiff's New York

Yankees cap; and (3) the theft of the picture of Jerusalem.   The Plaintiff conceded the

Defendant's contention that the first two acts cannot be considered harassment on the basis of the

Plaintiff's religion.  *Supra* at 16, n.6.  Moreover, as set forth above, the Plaintiff himself did not

believe the third act was based on his religion until the sign was placed on his door.  At the time

the Plaintiff first threatened to file a hostile work environment complaint, the Plaintiff did not,

and could not reasonably, believe he was being harassed on the basis of his religion.

Accordingly, the Plaintiff's January 27, 2009 threat was not protected activity because "no

reasonable employee could believe that the conduct about which []he complained amounted to a

hostile work environment under Title VII."  *Grosdidier v. Broad. Bd. of Governors*, — F.3d —,

No. 11-5291, 2013 WL 845289, at *4 (D.C. Cir. Mar. 8, 2013).

With respect to the Plaintiff's February 6, 2009 threat, the order of events is not itself

evidence of causality.  Undisputed evidence in the record indicates the Library began the process

to terminate the Plaintiff before February 6, 2009.  The fact that the Library followed through

with this course of action after the Plaintiff threatened to file a complaint is "no evidence

whatever of causality."  *Breeden*, 532 U.S. at 272.  Thus, the Plaintiff must rely entirely on

Morris Davis's statement that the Plaintiff's threat "solidified" his termination decision in

establishing causality.

Prior to the parties' February 6 meeting, the Library had already taken significant steps towards the Plaintiff's termination, including: (1) with consultation of the legal department, drafting a six-month evaluation that "set up" the Plaintiff's resignation or termination; (2) engaging in discussions with Plaintiff regarding whether he would resign; and (3) drafting the letter to the Director of the CRS recommending termination and forwarding that draft to the legal department.  Then, Morris Davis explained:

> Things came to a head on February 6th and caused my sympathy for Jeffrey to evaporate.  On that day, Ed and I were with Jeffrey when he gave a subordinate a performance evaluation. I asked Jeffrey to stay afterwards and asked him how his talks with HR were going.  He still wanted to stay on until April 2010 to reach full retirement, and when I told him that was not going to happen he said his choices were like having to choose between a rope and a bullet to commit suicide.  He continued to try to persuade me to let him stay in some capacity until 2010 or until he could find another job, but I told him those were not options and that if he couldn't choose I was going to have to move forward without his input.
>
> At that point he said he had endured a hostile work environment and no one did anything about it and the reason he had called the police before telling me about the sign was he knew I wouldn't do anything either. *He said he had a good law suit against us because of the hostile environment and we could avoid it by allowing him to stay until retirement or he found another job.  His threat solidified my decision*, so I ended the discussion and went back to my office to finalize the termination recommendation. At 3:00pm that day I (with Ed Bruner present) gave Jeffrey the termination notice signed by Dan Mulhollan and a memo from me directing him to turn in his blackberry, office key, and security card by the end of the day and not to return to the division without my approval. He was given 30 days with full pay and no work responsibilities so he could devote his full time and attention to finding another job.

Def.'s Ex. 6 at 11 (emphasis added); *see also* Pl.'s Ex. 6 at 152: 3-6.  The Plaintiff does not dispute Mr. Davis's characterization of the February 6 meeting.  Def.'s Ex. 13 at 6 ("Around 12 non on Feb 6, Morris Davis and Edward Bruner gave me the choice between resigning and receiving a two-month temporary appointment or termination with one month notice required by law.").

Considering the totality of the undisputed evidence in the record, no reasonable jury could conclude the Plaintiff's threat to file a hostile work environment complaint on February 6, 2009, was a motivating factor or a but-for cause of the Plaintiff's subsequent termination. The Library had already decided to separate the Plaintiff, it was simply up to the Plaintiff to indicate whether he would resign rather than face termination. The Plaintiff refused to make a decision, leaving the Library no choice but to proceed with the termination. The Plaintiff did not simply threaten to file a hostile work environment complaint, he made the threat as leverage in hopes the Library would allow him to stay on in some capacity until he found other employment. Moreover, Morris Davis did not terminate the meeting because the Plaintiff threatened to file a complaint, but rather because "[he] did not see the potential for fruitful discussions after being threatened." Def.'s Ex. 6 at 12. The issue was not that the Plaintiff engaged in protected activity; at the point the Plaintiff threatened to file a complaint it was clear discussing further the Plaintiff's options would not be fruitful. The Plaintiff's threat may have motivated Morris Davis to end the meeting rather than allow it to continue, but the decision to separate the Plaintiff from employment with the Library---be it by the Plaintiff's resignation or termination---was made *before* meeting, and *before* the protected activity. On this record, no reasonable jury could find the Plaintiff's threat was a motivating factor or but-for cause of his termination.

## IV. CONCLUSION

For the foregoing reasons, the Court finds the Defendant is entitled to summary judgment on the Plaintiff's hostile work environment and discrimination by termination claims, but genuine issues of material fact preclude summary judgment in favor of either party with respect to the Plaintiff's retaliation claim. Based on the summary judgment record, no reasonable jury could conclude the harassment arguably based on the Plaintiff's religion was sufficiently severe

27

or pervasive to be actionable, or that the Library failed to take adequate remedial action.  The Plaintiff also failed to produce any evidence to suggest his termination was based on his religion.  The Plaintiff's January 27, 2009 threat to file a hostile work environment complaint was not protected activity and thus cannot form the basis for a retaliation claim because no reasonable employee could believe the acts about which she complained amounted to a hostile work environment under Title VII.  Finally, the undisputed evidence in the record demonstrates the decision to end the Plaintiff's employment with the Library was made before his February 6, 2009 protected activity, precluding any reasonable jury from finding the Plaintiff's protected activity was a motivating factor or but-for cause of the Plaintiff's termination.  Accordingly, the Defendant's motion is GRANTED and the Plaintiff's cross-motion is DENIED.  An appropriate Order accompanies this Memorandum Opinion.

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE